# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

| | | |
|---|---|---|
| JEANIE RHOADS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | Case No. 4:22-cv-01196-SEP |
| | ) | |
| WEBSTER UNIVERSITY, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM AND ORDER

Before the Court are Defendant's Motion for Summary Judgment, Doc. [72], and Plaintiff's Motion for Leave to File Certain Documents Under Seal, Doc. [78].  For the reasons set forth below, Defendant's motion is denied in part, but Plaintiff must show cause why it should not be granted as to certain allegations made under Count I.  Plaintiff's sealing motion is denied.

### FACTS AND BACKGROUND[1]

Plaintiff Jeanie Rhoads brings this action against Defendant Webster University, alleging that the University made "certain fraudulent misrepresentations and/or material omissions to Plaintiff and others, regarding the online master's in counseling program and its [Council for Accreditation of Counseling and Related Educational Programs] accreditation status."  Doc. [39-1] ¶ 27.

The University offers a Master of Arts in Counseling with an Emphasis in Clinical Mental Health Counseling ("CMHC Program") at the University's main campus in Webster Groves, Missouri, and the University's campuses in Myrtle Beach, Charleston, and Columbia, South Carolina ("South Carolina Campuses").  Doc. [76] ¶ 4.  The CMHC Programs hold a specialty accreditation through the Council for the Accreditation of Counseling and Related Educational Programs ("CACREP").  *Id.* ¶ 5.  In 2019, the University sought to add an online Clinical Mental Health Counseling Program ("Hybrid Program") to its already CACREP accredited South Carolina Campuses.  *Id.* ¶ 7.  Dr. Muthoni Musangali, the Chair of the

---

[1] Unless otherwise noted, the facts in this section are not disputed.

Counseling Department at that time, led the University's efforts to secure CACREP for the Hybrid Program. *Id.* ¶ 8. One way for a university to get CACREP accreditation for a new program involves submitting a "Substantive Change Report" for CACREP's approval. *See id.* ¶ 11. Another way to get CACREP accreditation for a new program requires undergoing a "self-study," a more comprehensive process takes roughly one and a half years. *See id.* ¶ 38.

Dr. Musangali engaged with CACREP's then-Assistant Director of Accreditation, Kevin Connell, who recommended that the University submit a "Substantive Change Report" to add the online modality to the already accredited South Carolina CMHC Program. *Id.* ¶¶ 9-10. Dr. Musangali followed Connell's recommendation and submitted a Substantive Change Report on June 1, 2020. *Id.* ¶ 11. On August 21, 2020, CACREP sent Dr. Musangali a letter stating that the University's request had been "approved with conditions." *Id.* ¶ 12. The University was directed to submit a follow-up Substantive Change Report by November 15, 2020, addressing certain issues related to CACREP policy. *Id.* ¶ 13.

After receiving the letter, Dr. Musangali sent an email to the Vice President of Accreditation and Training at CACREP, Dr. Robert Urofsky, asking him to confirm that the University could "proceed to advertise and recruit for [the] program as CACREP-accredited." Docs. [79-2] at 1; [77-2] at 6. The next day, Dr. Musangali sent Director of Graduate Admissions Sarah Nandor and Graduate Admissions Counselor Wonjee Beh the following email:

> Hello. I have some great news. I was going to share this with you both yesterday but was waiting on confirmation from CACREP that we can now call our program CACREP-accredited. I have not heard back from them but am confident that this letter means that. The conditions stated here are easy to satisfy and am certain we will get this approved with out conditions. This is excellent news for us. I know Dean Wallner is already working with our marketing office to get the news out. Thank you both for all your support.

Doc. [79-3] at 4. Dr. Musangali also sent an email to the Counseling Department faculty and staff stating, in relevant part:

> Colleagues-
> I have some wonderful news!
> The Substantive Change for the Hybrid Program is approved. I emailed Robert Urofsky yesterday to confirm that we can now describe the program as CACREP accredited and was waiting on his response before I sent this email to you all. While

> I have not yet heard back, I do think that is what this letter means and I was just being super cautious.  The approval is conditioned on two items but these should be fairly easy to satisfy by the deadline.  I want to thank you all for your contributions to this program.

Doc. [79-4] at 1.  Dr. Musangali then sent an email to the Director of the Online Counseling Program, Diane O'Brien, stating:  "We will need to send this information to our students. They do not need to know about the conditions as that is ours to fix.  We can let them know about it verbally in class but not include it in any written communication to them as people may not always understand what that means."  Doc. [79-11] at 1.  Dr. O'Brien agreed and told Dr. Musangali that she would "send out an email using [the] new listserv for Hybrid students that simply refers to the accreditation of the program by CACREP."  *Id.*  Dr. Urofsky testified that had Dr. Musangali followed up on her email to him, he would have told her that the program could not be described as CACREP accredited.  Doc. [82] ¶ 16.  According to Dr. Urofsky, "approved with conditions" does not mean the program is CACREP accredited.  Doc. [77-2] at 6-7.

On November 14, 2020, Dr. Musangali submitted a follow-up Substantive Change Report, as CACREP requested in its August 21st letter.  Doc. [76] ¶ 17.  The University's Corporate Representative testified that between October 14, 2020, and January 12, 2021, the University circulated an email to prospective students who had expressed interest in the CMHC Program.  *Id.* ¶ 18.  The email stated, in relevant part:  "We are pleased to announce that our Online Master of Arts in Counseling/Emphasis in Clinical Mental Health Counseling is now CACREP accredited."  *Id.*  Plaintiff was one of the prospective students that received this email.  *Id.* ¶ 60.

Plaintiff also received an email from Graduate Admissions Counselor Meghan Higdon which read in part:  "Hello Jeanie, Thank you for your interest in Webster University's Counseling/Emphasis in Clinical Mental Health Counseling (MA) Program, accredited by CACREP."  Doc. [82] ¶ 56.  A few days later, Plaintiff sent Higdon an email asking the below question:

> Since Webster's Online Master of Arts in Counseling/Emphasis in Clinical Mental Health Counseling is now CACREP accredited, does this mean it is also accredited by the Higher Learning Commission and APA?  I know licensure varies by state, but I want to make sure that earning this particular degree will prepare and permit me to qualify for state licensure in general.

3

Doc. [77-17] at 1.  Higdon responded:

> The school as a whole is accredited by the Higher Learning Commission – this is our regional accreditation.  You would want any school you attend to have a regional accreditation.  As to APA, that is only accreditation for doctorate and postdoctoral programs within the fields of psychology, which we do not have, and therefore, do not need.

*Id.* at 2. Plaintiff went on to submit her application to the Hybrid Program on January 10, 2021. Doc. [82] ¶ 60.

On March 4, 2021, CACREP sent a letter to the University stating that the Board "disapproved the change."  Doc. [76] ¶ 19.  The letter explains that the University sought a "significant expansion" from South Carolina to a "nearly national" online program that would require "significantly increased scope and scale as well as additional resource and support needs." Doc. [74-15] at 1-2.  Because of the nature of the change, CACREP wrote "the program will need to submit a full self-study report addressing all standards." *Id.*

Dr. Musangali testified that she was "shocked" by the letter:  "Th[e] letter seem[ed] to be a reversal of approval already granted in the August 2020 letter.  And we had provided information as requested by CACREP by November 15 which I felt was sufficient to address the . . . conditions that had been contained in the . . . August 21st, 2020 letter.  I was confident that we had addressed those sufficiently from my perspective as a program, and I was therefore shocked to receive the March 4th letter." Doc. [74-5] at 15.

Plaintiff was accepted into the Hybrid Program on April 24, 2021.  Doc. [82] ¶ 61. On May 7, 2021, Dr. Musangali sent a Petition for Review of the Board's decision.  Doc. [76] ¶ 21.  A few weeks later, on May 27, 2021, Dr. Musangali met with Graduate Admissions Counselors Meghan Higdon and Emily Winslow, to notify them of CACREP's disapproval letter.  *Id.* ¶ 22.  The admissions department also used Slate—a system used by admissions staff to track communications with and inquiries by students—to formulate a list of students who were in the "'pipeline' or 'funnel,' meaning students who had submitted inquiries, students who had submitted applications, students who were accepted, and students who were enrolled." Doc. [82] ¶¶ 32, 33.  This information was provided to the Counseling Department.  *Id.* ¶ 35.  The admissions department was not instructed to send out any corrected information to prospective students who may have viewed information that the Hybrid Program was CACREP accredited.  *Id.* ¶ 31.

On June 1, 2021, Dr. Molly Stehn took over as the Chair of the Counseling Department.  Doc. [76] ¶ 24.  Dr. Stehn "immediately" began working with her colleagues to "draft messaging to prospective, incoming, and current students regarding the Hybrid Program's CACREP accreditation status as the University waited for CACREP's response to its Petition for Review."  *Id.* ¶ 25.  Dr. Stehn testified that she wanted the communication to be in writing so that "students would have a chance to read it and then ask any questions they might have."  Doc. [82] ¶ 37.  But the President of the University, Julian Schuster, "decided that nothing regarding accreditation would be put in writing, and no meetings would be recorded."  *Id.* ¶ 39.

The University's Corporate Representative testified that any references to the Hybrid Program being CACREP accredited were removed from the University website on June 2, 2021.  Doc. [76] ¶ 26. But emails show that on June 28, 2021, Counseling Department Chair Dr. Stehn asked Digital Content Developer Mitch Scheperle to make an "urgent edit" and "remove references to CACREP accreditation for the hybrid/online program ASAP a little more than halfway down this page: https://www.webster.edu/arts and-sciences/academics/professional-counseling/counseling.php[.]"  *Id.*; Doc. [79-6].

On July 8, 2021, the University held a Hybrid Summit for current and incoming Hybrid Program students.  Doc. [76] ¶ 27.  When Dr. Stehn was asked what she told the students in that meeting, she responded:

> This is where we informed them that we were not CACREP accredited for the hybrid program.  We did walk them through some of the history as to why we believed we were, and that we had then received communication that they – whatever their wording was – were disapproving the substantive change after giving us reason to believe that it was going to be approved.  And I also shared just the plan for moving forward, that we had already at this point started a new self-study and that we had also appealed their decision.  That Dr. Musangali had submitted an appeal.  And that we were waiting to hear from a response from CACREP that they would be meeting.  Their board meets every July and every January.  And that we would – they were going to be discussing our appeal letter at the July meeting and that we would expect to hear back about their decision likely in August.
>
> We also shared that this – or I shared that this was not a question of, you know, us – like, any – like, it wasn't a question of poor quality in the program.  That we – the program meets all of the same standards as the South Carolina program, but that CACREP had requested additional evidence.  And I compared it to the students when you write a research paper you need to cite your sources, you need to show your

work that – so just because you know something to be true you also need to provide the documentation of those facts like you do in a research paper.

So with the program we believed that we already are running, you know, a high-quality program that meets all the standards, and the evidence that we submitted that we had believed to be sufficient was not – did not satisfy CACREP on all of the standards.

Doc. [74-8] at 24.  In her deposition, Dr. Musangali confirmed that the University relayed the status of the Hybrid Program's accreditation status at the Hybrid Summit.

Q:  Do you recall that you – do you recall what was relayed to students during that hybrid summit?

A:  I was at the hybrid summit and we shared – hybrid summit was – we were sharing the information we had received where CACREP had essentially overturned the approval that they had previously granted us.  And that's what we shared with the students.  And also to let them know the things that we were working on to address the – what CACREP had given us as options what we were working on as a department at that time.

Q:  So did you tell the students that you all were appealing the decision, the disapproval decision?

A:  Yes, I – we shared that with students because we had then submitted the re-review request at that point and we were waiting on a result – on an outcome on a CACREP decision on the re-review request.

Q:  During the summit did you also share with the students that you were pursuing a self-study?

A:  Yes, we did.

Doc. [74-6] at 13-14.

Plaintiff attended the Hybrid Summit, but her recollection of the meeting is different.

Q:  And what was discussed regarding CACREP accreditation at the July 2021 summit meeting?

A:  They had let us know that they needed to do some paperwork with CACREP.

Q:  Is that the verbiage that they used during the meeting.

A:  Yes.

Q:  Was there any explanation about what the paperwork was for?

A:  No.

. . .

Q:  During the summit were you told that the hybrid CACREP program was not accredited?

A:  No.

Doc. [74-3] at 7.  When Plaintiff was asked in her deposition to provide the "words that were said to her during the summit meeting that [she] now contend[s] was a lie," Plaintiff responded:  "I don't remember the specific words used, but they had spoken to it as some type of bureaucratic paperwork filing proceedings."  *Id*. at 9.  Plaintiff testified that "[n]othing felt out of line.  It seemed like they were just clueing us in that they had some due diligence to do and they wanted us to know that they were on it, that it was just part of the order process with accreditation upkeep."  *Id*. at 26.  During the Hybrid Summit, Plaintiff wrote the following in her notebook:

> CACREP Accreditation under review again.
> -self study submitted to board (2-8 year valid)

Doc. [77-13].

On July 29, 2021, the University held a mandatory orientation led by Dr. Stehn.  Doc. [76] ¶¶ 30-31.  Dr. Stehn testified that she showed a slide stating, in relevant part:  "The hybrid program is awaiting an accreditation decision."  Doc. [74-8] at 35.  She added:

> Q:  In addition to what is listed there in writing in that PowerPoint slide, what other additional information did you provide students in attendance at orientation regarding the hybrid program's accreditation status?
>
> A:  Let's see.  After reviewing the current accreditations for the other two locations I would have clarified that the hybrid program is not currently accredited but we're awaiting a decision and we're in the process of submitting additional documentation.

Doc. [74-8] at 35-36.  Plaintiff disputes that Dr. Stehn announced to the students that the Hybrid Program was not CACREP accredited.  Plaintiff testified that, had the University announced that the Hybrid Program was not CACREP accredited, she "would have remembered that."  Doc. [77-9] at 16.  Plaintiff recalls the following about the orientation:

> Q:  What do you recall the conversation being about CACREP accreditation at the mandatory orientation?
>
> A:  The faculty were assuring us that everything was fine with CACREP and they needed to complete additional information paperwork requests.
>
> Q:  Were those the exact words used regarding CACREP accreditation?
>
> A:  I am paraphrasing.
>
> Q:  Did they say or give you any information about the status of the CACREP accreditation, whether it was not approved, awaiting approval, or approved?
>
> A:  They did not.  Not that I can remember.

Q:  Okay.  So is your answer that they didn't or are you saying that you don't remember?

A:  They didn't, as far as I can remember, talk about status.  I was paraphrasing before.  But they did – I can quote them verbatim in that they said that there's nothing to worry about.  They assured us that they had every phase – everything would be in line, and their body language all showed that they were guaranteeing, you know, assuring us.  Don't worry about anything.  We've got this.

*Id*. at 14.  Chelsea Gaarder, another prospective student at the orientation, testified about her recollection of the orientation.

A:  . . . I spoke to earlier that I remember CACREP being discussed, and I do remember them speaking to a logistical issue that it was nothing to worry about.

Q:  Do you recall whether or not they expressed that due to that logistical issue that that the hybrid program was awaiting an accreditation decision?

A:  I do not remember them saying that because that would have sent as a red flag.  They did not say that.

Doc. [74-4] at 65.

On August 6, 2021, Dr. Stehn received a letter from CACREP stating that the Executive Committee had upheld the Board's "disapproval" decision.  Doc. [76] ¶ 33.  The letter further stated that the Board "was actively reviewing digital delivery (i.e., online) in relation to counselor education programs" and would be "developing specific guidelines, templates, and timelines for programs to report on digital delivery modifications."  *Id*. ¶ 34.  The letter concluded by stating that the University's previously submitted substantive change report materials had been provided "to the Board committee for potential inclusion in a pilot review program to determine whether: (1) the changes proposed by Webster [could] be considered within this pilot program, (2) whether the review need[ed] to be suspended until full reporting guidelines and timelines [were] released, or (3) whether the original guidance to submit a full self-study [would] stand."  *Id*. ¶ 35.

On the first day of classes, August 16, 2021, Plaintiff received an email from Dr. Stehn with the subject line, "Update for hybrid clinical mental health counseling students."  *Id*. ¶ 36.  The letter stated:

We have received CACREP's response to our appeal letter, and their decision was to uphold their request for a new self-study.  The department continues to work on this, and will notify students once the program is granted CACREP accreditation.  Please speak with your advisor if you have any questions or concerns.

8

Doc. [74-22].  At her deposition, Plaintiff testified, "[t]his email is just as confusing to me

today as it was when we received it."  Doc. [74-3] at 36.  She elaborated:

> "We have received CACREP's response to our appeal letter."  I don't know what an
> appeal letter is.  I don't know what CACREP could be responding to.  I didn't know
> that they were awaiting responses and their decision.  I didn't know that there was
> decisions being made.
>
> Was to uphold their request.  I don't know what upholding their request means.  I
> don't know what request they're speaking of so how can something I don't know
> what it is be upheld.  I don't understand that.
>
> For a new self study.  I don't know what a self study is and I don't know what a self
> study entails.

*Id*. at 37.  The same day Dr. Stehn sent the email, Plaintiff asked for clarification from her

professor, Dr. Smith.  *Id*. at 27.  Plaintiff testified that she commented to Dr. Smith, "[i]t's not

that the program lost accreditation, it's just that it needs to maintain it."  *Id*.  According to

Plaintiff, Dr. Smith "nodded her head up and down signaling yes."  *Id*.

In October 2021, CACREP sent the University instructions for submitting a Digital

Delivery Substantive Change Request, another method to seek accreditation for the hybrid

program.  Doc. [76] ¶ 39.  CACREP's Assistant Director of Accreditation Kevin Connell

encouraged Dr. Stehn to submit a Digital Delivery Substantive Change Report because it

could "waive the necessity for a self-study."  *Id*. ¶ 41.  Dr. Stehn submitted the report on

November 30, 2021.  *Id*. ¶ 43.  The day before the report was submitted, Plaintiff sent the

Director of the Online Counseling Program, Diane O'Brien, an email about relocating back

to St. Louis.

> The opportunity for me to relocate *back* to St. Louis, MO from Durham, NC has come
> up and I wonder if you would you advise that I take the opportunity to move back,
> considering the Hybrid program's pending CACREP review?
>
> Specifically, I am thinking about continuing my classes in St. Louis, if possible, to
> secure graduating with the CACREP accreditation.  Can you clarify, if/when
> Webster's Hybrid program's CACREP accreditation is restored, will my cohort/class
> of 2023 still not be recognized as CACREP accredited by that time?  I'm unclear
> about the timing.
>
> Because of the pandemic, I chose the Hybrid program at Webster since it too had
> CACREP accreditation while allowing for flexibility and convenience during so many
> other unknown factors, but if transferring to St. Louis or another campus would
> guarantee accreditation (and staying on track for graduation in 2023, relocating
> would be a real option for me.

> Please let me know if you have any thoughts on the possibility. I appreciate any insight you could share with me!

Doc. [77-14] at 2. In her deposition, Plaintiff was asked, "you also acknowledge [in the email] that the CACREP review of the hybrid program is pending, correct?" Doc. [74-3] at 39. Plaintiff responded: "I do not. I do not know what program pending review means. As I typed and sent the email, I did not know what I was talking about. I did not [sic] what pending CACREP review entailed." *Id.*

Dr. O'Brien emailed Plaintiff back, providing the following information about the Hybrid Program's accreditation status:

> The Hybrid program is in the process of submitting self-study documents to CACREP. However, I cannot give a timeline as to when or what the decision of the CACREP board will be. That being said, your cohort would certainly be grandfathered in as having graduated from an accredited program.

Doc. [77-14] at 1. Plaintiff responded, in part: "It's good to know about the grandfathering will occur! I thought I had heard that grandfathering would only apply to students who had graduated within 18 months of the program receiving CACREP accreditation." *Id.*

Plaintiff testified that, at this point, "lots of discussion around CACREP ha[d] occurred" and she could not "remember what triggered [her] to write [the] email [to Dr. O'Brien]." Doc. [74-3] at 39. She notes she sent the email after she mistakenly received an email regarding the University's counseling program in Florida. *Id.* The email informed the students of the following:

> This summer 2021, the Florida State Board of Health announced that **persons graduating from a masters level counseling program on or after July 1, 2025, will be required to graduate from a CACREP accredited program.** The Webster University counseling program taught in Florida **IS NOT CACREP** accredited (it holds regional and national accreditations from CHEA and the Higher Learning Commission). Hence, to continue to pursue your graduate mental health career, **you must graduate from our program by May 2025 graduation date.**

Doc. [77-14] at 3 (emphasis original). Students were directed to respond to the email by cutting and pasting the following:

> 'I understand the contents of this email and the new Florida requirement regarding having to graduate from a CACREP accredited program on and after July 1[,] 2025. I also understand that the Webster University Professional Counseling Program, MA in counseling taught at Florida campuses and in which I am enrolled is not accredited by CACREP[.]'

10

*Id.* (emphasis original).

On February 28, 2022, Dr. Stehn received a letter from Gaarder sent on behalf of the Hybrid Program students. Doc. [76] ¶ 44. The letter stated, in relevant part:

> As a community, we harbor feelings of dismay, uncertainty, and frustration pointed towards the repetitive nature of miscommunication or lack of communication on important topics that inherently add stress to our plates and burdens to our shoulders. Specifically, the availability of advisors on general inquiries and the dark veil that covers the pending CACREP accreditation package are specific areas where we believe that communication needs to be addressed to ensure the success and wellbeing of students of the Hybrid cohort—in the present tense and for the future cohorts to come.

Doc. [74-26] at 2.

After receiving the letter, Dr. Stehn scheduled a town hall with the Hybrid Program students. Doc. [76] ¶ 47. Dr. Stehn testified that she told the students at the town hall that the department was in the process of writing the self-study and that she had just submitted the Digital Delivery Substantive Change. Doc. [74-8] at 31. Plaintiff testified that Dr. Stehn started the meeting with the statement, "Please spare me the CACREP questions." Doc. [74-3] at 51. Plaintiff recalled: "I have something in my memory about trying to give her grace and be like, okay, we won't bother you with any more CACREP questions, but can you at least tell us what it is that you're needing to give CACREP so we can understand what's lacking, what's the paperwork all about, what's actually going on so we can weigh how big is this problem." *Id.* Gaarder did not remember much from the meeting, but she recalled being told that they would hear back from CACREP about the self-study on March 15, 2022. Doc. [74-4] at 46. Dr. Stehn testified that she believed the students at the town hall demonstrated an understanding that the Hybrid Program was not CACREP accredited. Doc. [74-8] at 40. Plaintiff testified that she did not understand that the Hybrid Program was not accredited, stating:

> Because approved – we didn't know what a review was or what a self study was. So if a review was approved, I don't know if that – was that the first and only step? If a self study is being reviewed, is that the first or last step? Is this an extension of approval? Was it lost? Was it never accredited? We had no idea. We didn't know if this was a maintenance thing and it was to extend its accreditation or if this was they needed extra paperwork to maintain the accreditation or they basically were accredited but for it to be official, the hybrid had to go through a self study just like South Carolina, et cetera.

11

We really had no idea how the system worked, how the process worked. No one was giving us answers. We could not make contact with our advisers. So this town hall was a chance to look at the chair head in the eye and say this has been our experience thus far.

Doc. [74-3] at 52.

On March 15, 2022, CACREP sent Dr. Stehn a letter stating, in relevant part:

The Board indicated that its review and its comments on the program's digital delivery pilot report do not constitute an approval or accreditation decision for the expanded, nationwide online delivery method. Rather, the Board determined that, for this delivery method to be recognized as an accredited offering, the program should submit a full self-study for review.

Doc. [74-28] at 2. The letter also directed the University to notify the students currently enrolled in the Hybrid Program that the program was not CACREP accredited. *Id.* On March 23, 2022, Dr. Stehn issued the following notice to students in the Hybrid Program:

The Department of Professional Counseling has received CACREP's response regarding the digital delivery substantive change report that we submitted last fall. After the board met this past January, they have determined that they do not approve our nationwide online program as part of our existing accredited program based in South Carolina at this time. They stated that in order for the hybrid program to become accredited, the department must submit a full self-study for CACREP to review.

The self-study is a large document that describes and documents how our program meets all of the 2016 CACREP standards. We will need to compile updated documentation and data, and we expect to submit this within the next year.

While we wish the outcome were different, we are confident in the quality of our program and are up to the task of completing the self-study.

Sincerely,

Molly Stehn

Doc. [74-29]. According to Plaintiff, this was the first time she was informed that the Hybrid Program was not CACREP accredited or approved as a part of the South Carolina accredited program. Doc. [74-3] at 17.

Shortly after receiving the email from Dr. Stehn, Gaarder sent an email to Dr. Stehn stating, in relevant part:

Further documented issues that I could expand upon if necessary:

-Lack of proper syllabus provided on Canvas two days before class starts, much of what was provided was severely lacking in specific expectations or any sort of grading rubric for the assignments.  There are no due dates or modules used.  You specifically spoke about CACREP accreditation being withheld last time surrounding issues with the full realm of services being offered in a digital, online platform.  I would imagine this is one of the many issues that I recognize as being in line with their concerns around the issue of equal quality.

. . .

-The following passage is included in the "syllabus" we received, which I would consider the peak of my concerns, as it is either completely unexplainably included in the same way curse words would be inappropriately included, or we are being completely lied to by you in regards to CACREP accreditation even being something that is being sought after for this program.  Either is not acceptable, the first is clearly preferable, and I would like clarity on what the truth is.

"While the program is neither accredited nor currently actively preparing for accreditation at other campuses, students at other campuses and/or enrolled in other tracks are still held to these standards as these represent best practices in the field of counselor education."

Doc. [79-8].  Gaarder testified that other students assisted her with drafting the email.  Doc. [76] ¶ 44.

A day after receiving the email from Dr. Stehn that the Hybrid Program was not CACREP accredited, Plaintiff sent Dr. Stehn an email stating in relevant part:

Simply put, going into significant student loan debt to me was a worthwhile investment when the Hybrid program was CACREP accredited, but I would not have pursued Webster's Counseling Hybrid Program without it.  Since orientation, I trusted and believed in the Hybrid Program with assurances from you and Dr. O'Brien.  Now, how can I continue to gamble on what would be financial ruin, when no one will tell us what criteria the program doesn't meet and specify what changes are being made to become accredited?

Nearly halfway to graduation, I am and [sic] sick to my stomach trying to decide before tomorrow's deadline to drop my classes without charge, or continue in blind faith with a program that cannot be relied on to accurately inform us of what textbook is needed for class . . .  We have been paying for tuition for a program which was accredited, so I must ask, can we expect a refund for utterly losing this academic year?  It is wrong to require that students pay the tuition rate of a program which is not adjusted for having lost its accreditation, and the University should make this right to students.

Whether I stay or leave, I must seek justice for the lost tuition, time, and credits that cannot be transferred, even if I were to restart my process with a different program.  It saddens me to say that my fellow students and I have organized and obtained legal

13

counsel in support of rectify this incredibly hurtful and disappointing experience within a program whose leaders know better.  You must realize and be able to appreciate how important and damaging this has been.  Students, I included, are in crisis over this.

Please, tell me what support and corrections we can expect from the University.

Doc. [74-39] at 3-4.  Dr. Stehn responded with information on how Plaintiff could withdraw and transfer her credits.  *Id.* at 2-3.  In a later email to Plaintiff, Dr. Stehn confirmed that the deadline to withdraw was March 25, 2022, at 11:59 pm.  *Id.* at 1.  Plaintiff withdrew from the Hybrid Program on March 25, 2022.  *Id.*

Between April 1, 2022, and April 8, 2022, Plaintiff and Gaarder exchanged the following relevant text messages:

- Gaarder responding to a voice memo sent by Plaintiff:  "Are you saying that the Hybrid program has never even applied for CACREP?!

    o Plaintiff:  "I don't know about applied, but sounds like Hybrid never had it"

    o Gaarder:  "If that is the case, we for SURE will win that lawsuit because we have direct communication from the school speaking to the exact opposite . . . .  I think we should try to find out whether they ever applied. Do we have written documentation where they claim that the hybrid program lost accreditation?"

- Gaarder:  "Do we have any documentation of them saying that they lost status rather than their only trying to primarily gain it?"

- Plaintiff:  "The student handbook that was given to us in August, says that only the St. Louis and South Carolina campus locations are accredited.  And one of the slides from a new student package email from Dr. Smith also says that the Hybrid program is under review (dated August).  To make me feel more solid in our evidence, I really want to find the Zoom email invite to orientation for language they used when first announcing CACREP loss."

- Plaintiff:  "I'm curious to recall how they worded inviting us to learn about the news around Hybrid CACREP [during the orientation in July 2021]."

- Gaarder:  ". . . They literally didnt [sic] tell us they weren't accredited until the first day of class.  So they already had our money.  I thought is [sic] was a few days before.  Nope.  You are absolutely right.  Ya, I don't know how they argue that."

- Plaintiff:  "no one saying that they didn't tell us they weren't [CACREP] accredited, we're saying that they told us way too late and here and here is all the evidence proving what way too late means; plus, they manipulated us into

thinking that they had it under control and all would be accredited soon.  And they kept assuring that, until we lost trust."

Doc. [74-42].

Dr. Stehn resigned as Counseling Department Chair on May 31, 2022, and Dr. Musangali took over as Chair.  Doc. [76] ¶ 53.  The University worked to "secure CACREP accreditation by having an on-going conversation with CACREP, continuing its work on the full self-study, and submitting a second Substantive Report with additional reporting details pursuant to CACREP's digital pathway procedures in September 2022."  *Id.* ¶ 54. And on May 4, 2023, the University received a letter from CACREP stating that the "the Board has approved the inclusion of the fully digital pathway in the accreditation for the Clinical Mental Health Counseling specialty area at Webster University, South Carolina, but will initiate additional reporting requirements on necessary adjustment to the digital pathway."  *Id.* ¶¶ 55-57.  CACREP issued another letter on June 13, 2023, which "outlined the additional reporting requirements" and "clarified that **graduates of the fully digital pathway from March 2020 forward were considered graduates of the CACREP accredited program.** "*Id.* ¶ 58 (emphasis original).

Plaintiff filed suit against the University on November 3, 2022, alleging fraudulent misrepresentation, fraud by concealment and omission, and violation of the Missouri Merchandising Practices Act.  Defendant moves for summary judgment on all claims.

### Legal Standard

A court must grant a motion for summary judgment if it finds, based on the factual record, that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); Fed. R. Civ. P. 56.  Material facts are those that "might affect the outcome of the suit under the governing law," and there is a genuine dispute where "a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The moving party bears the initial burden of "informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex Corp.*, 477 U.S. at 323 (quotation marks omitted).  The non-movant must then "present specific evidence, beyond

'mere denials or allegations [that] . . . raise a genuine issue for trial.'" *Farver v. McCarthy*, 931 F.3d 808, 811 (8th Cir. 2019) (quoting *Wingate v. Gage Cnty. Sch. Dist., No. 34*, 528 F.3d 1074, 1078-79 (8th Cir. 2008)). "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:  (A) citing to particular parts of materials in the record . . .; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1).  The evidence must be viewed "in the light most favorable to, and making all reasonable inferences for, the nonmoving party." *Carmody v. Kansas City Bd. of Police Comm'rs*, 713 F.3d 401, 404 (8th Cir. 2013).  "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011).  "'If reasonable minds could differ as to the import of the evidence,' summary judgment is inappropriate." *Quick v. Donaldson Co.*, 90 F.3d 1372, 1377 (8th Cir. 1996) (quoting *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 256 (1986)).

### Discussion

As set forth below, Defendant has not met the standard for summary judgment on Count I as to statements (a) through (c), nor has it earned summary judgment on Count II or Count III.  Plaintiff will have an opportunity to  show cause why summary judgment should not be granted to Defendant on Count I as to statements (d) through (g).[2]

---

[2] Defendant spends several pages arguing that the Complaint fails to meet the heightened pleading requirements of Rule 9(b).  "To satisfy the particularity requirement of FRCP 9(b), the complaint must plead such facts as the time, place, and content of the defendant's false representations, as well as the details of the defendant's fraudulent acts, including when the acts occurred, who engaged in them, and what was obtained as a result." *United States ex rel. Joshi v. St. Luke's Hosp., Inc.*, 441 F.3d 552, 556 (8th Cir. 2006).  In essence, "the complaint must identify the who, what, where, when, and how of the alleged fraud." *Id.* (quotation marks and citation omitted).  On review of Plaintiff's Complaint, the Court finds that it meets the heightened pleading requirements of Rule 9(b).

I.    **Summary judgment is not warranted on Count I as to statements (a), (b), and (c): Plaintiff must show cause why summary judgment should not be granted as to statements (d), (e), (f), and (g).**

In Count I, Plaintiff alleges that Defendant made the following misrepresentations regarding the Hybrid Program's accreditation status:

(a) "The Online Master of Arts in Counseling/Emphasis in Clinical Mental Health Counseling is now CACREP accredited" (Listed on website);

(b) The online master's in counseling is CACREP accredited;

(c) There was a "logistical" issue with Defendant's CACREP accreditation that would be easily resolved;

(d) The CACREP accreditors were requiring a new self-study from Defendant, and then they would receive the accreditation;

(e) Plaintiff's cohort would be "grandfathered in" as graduating from a CACREP accredited program;

(f) The required self-study had been submitted to CACREP in November of 2021, and Defendant would have an answer from CACREP's review by February;

(g) Plaintiff would receive a full refund if she withdrew by March 25, 2021.[3]

Doc. [39-1] ¶ 31.  Plaintiff claims that she relied on those misrepresentations in her decision to enroll in the Hybrid Program.  *Id.* ¶¶ 36-38.

"The elements of fraudulent misrepresentation are:  (1) a representation; (2) its falsity; (3) its materiality; (4) the speaker's knowledge of its falsity or ignorance of its truth; (5) the speaker's intent that it should be acted on by the person in the manner reasonably contemplated; (6) the hearer's ignorance of the falsity of the representation; (7) the hearer's reliance on the representation being true; (8) the hearer's right to rely thereon; and (9) the hearer's consequent and proximately caused injury."  *Renaissance Leasing, LLC v. Vermeer Mfg. Co.*, 322 S.W.3d 112, 131-132 (Mo. 2010) (en banc).  Defendant moves for summary judgment, arguing that Plaintiff has failed to establish a prima facie case of fraudulent misrepresentation.

The Court is sympathetic with Defendant's argument that statements (d) through (g) cannot support Plaintiff's fraudulent misrepresentation claim because they were made

---

[3] The Court assumes that Plaintiff meant 2022 and grants her leave to amend the Complaint accordingly.

*after* Plaintiff had already enrolled in the Hybrid Program, and so she cannot have relied on them in deciding to enroll.  *See Williams v. HSBC Bank USA, N.A.*, 467 S.W.3d 836, 845 (Mo. App. Ct. 2015) ("Because of the requirement of reliance, a claim of negligent misrepresentation will not be successful where the plaintiff took the action which caused the damage before hearing the alleged misrepresentation . . . ."); Docs. [74-22] (statement (d) – August 16, 2021); [77-14] (statement (e) – November 30, 2021); [39-1] ¶¶ 15-16 (statement (f) – between November 2021 and February 2022);[4] [74-39] (statement (g) – March 24, 2022).  Because this argument was raised in Defendant's reply, *see* Doc. [81] at 5-10, Plaintiff may have 14 days to show cause why summary judgment should not be granted on Count I as to the alleged misrepresentations (d) through (g).

As to statements (a), (b), and (c), Defendant argues that the record shows that Plaintiff relied on truthful statements in her decision to enroll in the hybrid program.[5] Defendant points to Dr. Stehn's testimony that prospective students were told at the Hybrid Summit and the mandatory orientation that the Hybrid Program was not CACREP accredited.  *See* Doc. [74-8] at 23-24; Doc. [82-8] at 35-36.  Defendant also claims the text messages between Plaintiff and Gaarder suggest Plaintiff knew the Hybrid Program was not CACREP accredited.  Doc. [74-42].

The record is replete with conflicting evidence as to what information Defendant communicated regarding the Hybrid Program's accreditation status.  Viewing that evidence in the light most favorable to Plaintiff, a reasonable jury could find that Defendant failed to tell Plaintiff prior to her enrollment that the Hybrid Program was not CACREP accredited or falsely represented the Hybrid Program's accreditation status on four separate occasions: First, when the University circulated an email to prospective students announcing that the Online Master of Arts in Counseling/Emphasis in Clinical Mental Health Counseling was "now CACREP accredited"; second, when Graduate Admissions Counselor Meghan Higdon sent Plaintiff an email thanking her for her "interest in Webster University's

---

[4] The Court relies on the dates in the Complaint for statement (f).

[5] Defendant also argues that statement (c) is not actionable as a matter of law because it is a statement of opinion, expectation, or prediction of future actions of a third party.  The Court disagrees.  A reasonable juror could understand statement (c) as a factual claim about a contemporaneous state of affairs.

Counseling/Emphasis in Clinical Mental Health Counseling (MA) Program, accredited by CACREP"; third, when Plaintiff read on the University's website that the Hybrid Program was CACREP accredited;[6] and fourth, when Plaintiff was told at the mandatory orientation that there was a "logistical issue" with the accreditation but that it was "nothing to worry about." Docs. [74-4] at 24; [76] ¶¶ 17, 18, 26, 60; [77-9] at 14, 16; [82] ¶ 56; [82-1]. Because "reasonable minds could differ as to the import of the evidence," Defendant's motion for summary judgment on Count I as to statements (a), (b), and (c) is denied.[7]

## II.    **Defendant is not entitled to summary judgment on Count II.**

In Count II, Plaintiff alleges that Defendant had a duty to disclose to Plaintiff the following information:

(a) Webster University's online master's in counseling program was not CACREP accredited;

(b) Webster University's online master's in counseling program had never been CACREP accredited;

(c) Webster University had never applied for CACREP accreditation for their online master's in counseling program;

(d) The class of students Plaintiff would be graduating with would not be "grandfathered in" because the program had never been CACREP accredited;

(e) A self-study was never turned in to the CACREP accreditation institution.

Doc. [39-1] ¶ 43. Plaintiff claims that, but for the fraudulent omissions, she would not have enrolled in the Hybrid Program. *Id.* ¶ 51.

"Missouri courts have not recognized a separate tort of fraudulent nondisclosure." *Richards v. ABN AMRO Mortg. Grp., Inc.*, 261 S.W.3d 603, 607 (Mo. Ct. App. 2008) (citing

---

[6] On the Court's review of the record, Plaintiff never testified that she saw on the University's website that the Hybrid Program was CACREP accredited. But Slate records show that she visited the website multiple times between October 2020 and January 2020. Doc. [82-1]. Because Plaintiff visited the website before the date upon which Defendant claims to have removed any references to the Hybrid Program being CACREP accredited, *see* Doc. [76] ¶ 26, the Court finds a genuine issue of material fact as to whether Plaintiff relied on the representation in paragraph (a).

[7] Defendant argues that the record shows that any loss suffered by Plaintiff was due to her own conduct because "had Rhoads remained in, and graduated from, the Hybrid Program, she would have a CACREP accredited degree." Doc. [73] at 14. But at the time Plaintiff withdrew, the Hybrid Program was not CACREP accredited. Because Defendant does not argue that Plaintiff knew or should have known that accreditation would be received in the future, and in time to affect her degree, the Court declines to hold Plaintiff responsible for failing to foresee those developments.

*Hess v. Chase Manhattan Bank, USA, N.A.*, 220 S.W.3d 758, 765 (Mo. 2007)).  "Instead, in such cases, a party's silence in the face of a legal duty to speak replaces the first element [of a fraudulent misrepresentation claim]: the existence of a representation."  *Hess*, 220 S.W.3d at 765.  "Whether or not a duty to disclose exists . . . must be determined on the facts of the particular case."  *Id.* (quoting *Ringstreet Northcrest, Inc. v. Bisanz,* 890 S.W.2d 713, 720 (Mo. Ct. App. 1995)).  "A duty to speak arises where one party has superior knowledge or information that is not reasonably available to the other."  *Id.*  "Even with superior knowledge, a duty to disclose will be imposed only if the material facts would not be discovered through the exercise of ordinary diligence."  *Id.*

Defendant moves for summary judgment, arguing that the Hybrid Program's accreditation status was "reasonably available to Rhoads because Webster voluntarily disclosed the information."  Doc. [73] at 15.  As noted in Section I, there is considerable factual dispute as to what information was communicated about the Hybrid Program's accreditation status.  Summary judgment is therefore denied.

### III.    Defendant is not entitled to summary judgment on Count III.

Finally, in Count III, Plaintiff alleges that Defendant violated the Missouri Merchandising Practices Act.  Plaintiff's MMPA claim is based on the misrepresentations and omissions set forth in Counts I and II.  The MMPA declares unlawful the use of "any deception, fraud, false pretense, false promise, misrepresentation, unfair practice or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise . . . ."  Mo. Rev. Stat. § 407.020.1.  "To establish a claim under the MMPA, a plaintiff must show that she (1) leased or purchased a product or service from defendant; (2) primarily for personal, family, or household purposes; and (3) suffered an ascertainable loss of money or property; (4) as a result of an act declared unlawful by § 407.020 RSMo."  *Schulte v. Conopco, Inc.*, 997 F.3d 823, 825-26 (8th Cir. 2021) (quoting *Toben v. Bridgestone Retail Ops., LLC*, 751 F.3d 888, 897 (8th Cir. 2014)).  Defendant moves for summary judgment on Plaintiff's MMPA claim, making four separate arguments:

(1) Webster did not engage in any deceptive conduct.

(2) Plaintiff's MMPA claim fails as a matter of law because Plaintiff's purchase was for business, career, and professional purposes.

(3) Plaintiff has not alleged that Defendant possessed the requisite state of mind for her MMPA omission-based claim because the University "disclosed and delivered truthful information to [Plaintiff] regarding the Hybrid Program's CACREP accreditation status."

(4) Plaintiff's MMPA claim fails as a matter of law because any loss suffered by Plaintiff was due to her own conduct and not due to any conduct of Defendant.

Doc. [73].  Defendant's third and fourth arguments are rejected for the reasons articulated in Sections I and II.  Defendant's first and second arguments also fail, as set forth below.

### A.  A reasonable juror could find that Webster engaged in deceptive conduct.

Defendant first argues that Plaintiff has failed to "point to any competent evidence to demonstrate that Webster engaged in a practice declared unlawful under section 407.020.1." *Id.* at 17.  That argument fails as to statements (a), (b), and (c) under Count I and the omissions outlined in Count II for the reasons already stated in Sections I and II. Defendant's stronger argument for summary judgment on Count I with respect to statements (d), (e), (f), and (g)—*i.e.,* that Plaintiff has not shown reliance—has no purchase on Count III because "the MMPA supplements the definition of common law fraud, eliminating the need to prove an intent to defraud or *reliance.*"  *Schuchmann v. Air Services Heating & Air Conditioning, Inc.*, 199 S.W.3d 228, 233 (Mo. Ct. App. 2006) (emphasis added). "The use of an unlawful practice is a violation of the MMPA 'whether committed before, during or after the sale,' so long as it was made 'in connection with' the sale."  *Conway v. CitiMortgage, Inc.*, 438 S.W.3d 410, 414 (Mo. 2014) (citing § 407.020(1)).  Defendant does not argue that the statements were not made in "connection with the sale."

Defendant argues that statements (d) through (f) refer to statements of opinion, expectation, or prediction of future actions of a third party, which cannot support Plaintiff's MMPA claim.  Plaintiff counters that "incorrect and false statements about the accreditation status *at the present time the statement was made*, not promises or representations about the future or statements about what a third party might do."  Doc. [75] at 14.  The Court agrees with Plaintiff that a reasonable juror could understand statements (c) through (f) as factual claims about contemporaneous states of affairs. Whether those statements were made; what their implications were in context; and their veracity are all disputed questions of material fact for a jury to decide.

Defendant also argues that the statements (f) and (g) cannot form the basis for Plaintiff's MMPA claim because the statements were not made to Plaintiff.  According to Defendant, "[s]tatements made to others are hearsay which are inadmissible and cannot support Rhoads' claim."  Doc. [73] at 15.  Of course, not all out-of-court statements are hearsay, including statements of an opposing party.  *See* Doc. [75] at 15; Fed. R. Evid. 801(d)(2).  And while the Court is not prepared to make a final determination of the admissibility of statement (e) for any particular purpose at trial, that is not necessary at the summary judgment stage, when all that matters is "whether it *could* be presented at trial in an admissible form"—a standard that Defendant does not even mention.  *Gannon Int'l, Ltd. v. Blocker*, 684 F.3d 785, 793 (8th Cir. 2012) (citing Fed. R. Civ. P. 56(c)(2)) (upholding a district court's overruling of a hearsay objection at summary judgment where the party did "not even attempt to argue that the information . . . could not have been presented in an admissible form at trial").  Defendant's objection to Plaintiff's reliance on statement (e) at the summary judgment phase is therefore overruled.

Finally, Defendant argues there is no evidence that anyone at the University made statement (g)—that Plaintiff would receive a full refund if she withdrew by March 25, 2022.  But Dr. Stehn testified as follows:

> Q:  Okay. When you sent out the March 2022 email did you have students asking to withdraw?
>
> A:  Yes.
>
> Q:  Were they only give [sic] a 24-hour window to withdraw for a full refund to your knowledge?
>
> A:  I informed them that the drop/add deadline was that – you know, that Friday, at the end of day Friday.
>
> Q:  Do you think that would have been about 24-hours notice?
>
> A:  Possibly.
>
> Q:  So you just testified you let them know what that withdrawal window was, right, in March of 2022?
>
> A:  Yes.

Doc. [74-8] at 39.  Dr. Stehn's testimony is consistent with the email she sent to Plaintiff on March 24 and 25, 2022, after Plaintiff emailed her about withdrawing from the program:

> Plaintiff's email:  "Nearly halfway to graduation, I am and sick to my stomach trying to decide before tomorrow' deadline to drop my classes without charge, or continue

in blind faith with a program that cannot be relied on to accurately inform us of what textbook is needed for class...We have been paying for tuition for a program which was accredited, so I must ask, can we expect a refund for utterly losing it this academic year? It is wrong to require that students pay the tuition rate of a program which is not adjusted for having lots its accreditation, and the University should make this right to students."

Dr. Stehn's response:  "If you wish to withdraw, please drop your classes before the deadline and let me know of your decision ."

Plaintiff's response the following day: "Can you confirm when the deadline is to withdraw? At midnight tonight as in 3/25 Thursday, 00:00 EDT or 3/26 Friday, 00:00?

Dr. Stehn's response: "The deadline is tomorrow at the end of the day, and if you submit a request prior to 11:59 tomorrow night it will be honored even if no one responds to your message."

Doc. [74-39].  Viewing the evidence in the light most favorable to Plaintiff, there is a genuine dispute of material fact as to whether Defendant represented to Plaintiff that she would receive a full refund if she withdrew by March 25, 2022.

**B. A reasonable juror could find that Plaintiff purchased her education primarily for personal use.**

As to Defendant's second argument—that Plaintiff's MMPA claim fails as a matter of law because Plaintiff's purchase was for business, career and professional purposes—the Court finds *Kerr v. Vatterott Educational Centers, Inc.*, 439 S.W.3d 802 (Mo. Ct. App. 2014), instructive.  There, the Missouri Court of Appeals rejected a similar argument where, alongside evidence of a professional purpose, there was also sufficient evidence in the record for a reasonable jury to infer that the education was purchased primarily for a personal purpose. *Id.* at 809-11 (distinguishing *MacDonald v. Thomas M. Cooley Law School*, 724 F.3d 654, 661 (6th Cir. 2013).

Here, like the plaintiff in *Kerr*, Plaintiff has provided other reasons besides professional ambitions for purchasing her education.  Specifically, Plaintiff testified to her understanding that she needed a master's degree to become a licensed counselor Doc. [74-3] at 9. When asked if there was any particular reason she chose to pursue counseling, Plaintiff responded:

By that time, the pandemic was weighing on everyone, and I started doing side work for the company organizing mental health – mental health trainings for managers, how to cope with employees burning out, how to take care of ourselves.  I was also

leading virtual yoga classes for the company and I was good at it. My clients joked that I was their business therapist, and I decided it was time to pursue my true calling and finally become a real therapist and do all of that kind of free passion project side work as my main career.

Doc. [74-3] at 12-13. Thus, viewing the evidence in the light most favorable to Plaintiff, a reasonable jury could find that Plaintiff purchased her education primarily for personal use.

Because Defendant has not demonstrated that "there is no genuine issue as to any material fact and that [Defendant] is entitled to a judgment as a matter of law," Defendant's motion for summary judgment on Count III is denied. *Celotex Corp.*, 477 U.S. at 322.

### MOTION FOR SEALING

There is a "common-law right of access to judicial records." *IDT Corp. v. eBay*, 709 F.3d 1220, 1222 (8th Cir. 2013). "The presumption of public access to judicial records may be overcome if the party seeking to keep the records under seal provides compelling reasons for doing so." *Flynt v. Lombardi*, 885 F.3d 508, 511 (8th Cir. 2018) (citing *In re Neal*, 461 F.3d 1048, 1053 (8th Cir. 2006)). "[T]he weight to be given the presumption of access must be governed by the role of the material at issue in the exercise of Article III judicial power and [the] resultant value of such information to those monitoring the federal courts." *IDT Corp.*, 709 F.3d at 1224 (quoting *United States v. Amodeo*, 71 F.3d 1044, 1049 (2d Cir. 1995)). "[J]udicial records and documents generally will 'fall somewhere on a continuum from matters that directly affect an adjudication to matters that come within a court's purview solely to insure their irrelevance.'" *Id.* at 1223 (quoting *Amodeo*, 71 F.3d at 1049). When documents are filed with dispositive motions, the presumption of public access is harder to overcome. *See Ball-Bey v. Chandler*, 2024 WL 888396, at *4 (E.D. Mo. Feb. 13, 2024) (collecting cases).

Plaintiff moves to file under seal certain exhibits filed in conjunction with her memorandum in opposition to Defendant's motion for summary judgment. *See* Doc. [78]. Plaintiff's sole stated justification for sealing the information is that such documents have been designated as confidential pursuant to the Protective Order in effect in this matter. *Id.* at 2. The fact that information was disclosed pursuant to the parties' protective order is not, on its own, a sufficient legal justification for sealing. *See* E.D. Mo. L.R. 13.05(A)(3).

24

Therefore, on the record before the Court, the parties' interest in maintaining confidentiality is outweighed by the public's interest in viewing the Court record.

If any party does not want the materials unsealed, it must meet the legal standard for sealing.  Unless a meritorious sealing motion is filed in compliance with Local Rule 13.05, within 14 days of the date of this Order the Court will order the clerk to unseal Doc. [79] and its attachments.

Accordingly,

**IT IS HEREBY ORDERED** that Defendant's Motion for Summary Judgment, Doc. [72], is **DENIED** as to Count I (statements (a), (b), and (c)), Count II, and Count III.

**IT IS FURTHER ORDERED** that, no later than October 6, 2025, Plaintiff shall show cause why summary judgment should not be granted on Count I as to statements (d) through (g).

**IT IS FURTHER ORDERED** that Plaintiff's Motion for Sealing, Doc. [78], is **DENIED**.

**IT IS FURTHER ORDERED** that this Order is stayed for fourteen (14) days to allow for appeal of the denial of sealing Doc. [78] or filing of a meritorious motion for leave to file under seal in conformity with Local Rule 13.05.  *See* E.D. Mo. L.R. 13.05(A)(4)(g).  Any motion for sealing that complies with Local Rule 13.05 must be filed no later than October 6, 2025.  Failure to timely file such a motion will result in the unsealing of Doc. [79] and its attachments without further notice.

**IT IS FINALLY ORDERED** that Plaintiff is granted leave to file an amended complaint as set forth herein.  *See supra* page 17 n.3.

Dated this 22nd day of September, 2025.

SARAH E. PITLYK
UNITED STATES DISTRICT JUDGE

25